# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 5:19-MJ-00047 |
| Two digital devices seized on September 5, 2017, and currently in the custody of the Federal Bureau of Investigations in Colton, California | ) ) ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment B | |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Keith A. MacCalla, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Riverside, CA

_____
*Printed name and title*

AUSA: Scott Lara (213) 894-0427

## ATTACHMENT A

<u>PROPERTY TO BE SEARCHED</u>

The following two digital devices (collectively the "SUBJECT DEVICES"), which were seized on September 5, 2017, and are currently maintained in the custody of the Federal Bureau of Investigation in Colton, CA:

1.   One black and red HTC cellular telephone, model # OPM9110, FCC ID # NM80PM9110 with no subscriber information, International Mobile Equipment Identity number 35267807886842. ("SUBJECT DEVICE 1").

2.   One gold Samsung Galaxy Note 5 cellular telephone with a shattered back glass plate found in the center console of an abandoned Jeep bearing license plate 7XIY986. ("SUBJECT DEVICE 2")

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) and 21 U.S.C. §§ 841(a)(1), (b)(1) (Possession with Intent to Distribute a Controlled Substance) (the "Subject Offenses"), namely:

    a. Any communications regarding the manufacture, possession, distribution, sale, or storage of illegal drugs;

    b. Data, records, documents (including e-mails), or information reflecting or referencing large quantities of money, or purchases of merchandise, securities, electronic currency, and other valuable things;

    c. Records, documents, programs, applications, photographs, screenshots, images, or materials relating to  the distribution of drugs, including ledgers, pay/owe records, distribution or customer lists, drug proceeds, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

    d. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

i

e.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

f.    Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the above-described offenses;

g.    Contents of any calendar or date book;

h.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

i.    Call log information showing the telephone numbers, date, and time of the calls made to and from the SUBJECT DEVICES that are cellular telephones; and

j.    Contact lists or address books stored on the SUBJECT DEVICES that are cellular telephones.

k.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

l.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries,

configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## VII. SEARCH PROCEDURE FOR THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICES and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return

the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

g.   If the search determines that a SUBJECT DEVICE
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

h.   If the search determines that the SUBJECT DEVICE
is (1) itself an item to be seized and/or (2) contains data
falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

4.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Keith A. MacCalla, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since July 2014.  I am currently assigned to the Los Angeles Field Office, Riverside Resident Agency, Violent Crime Squad.  Since August 2015, I have been assigned to the FBI Los Angeles Gang Impact Team ("FBI LA GIT"), a joint federal and state gang task force. In this capacity, I investigate, among other things, criminal street gangs and the trafficking of narcotics.  I have received specialized training in conducting criminal investigations and have consulted with my colleagues who have many years of experience investigating criminal street gangs and narcotics trafficking.

2.   Prior to working for the FBI, I was a Border Patrol Agent from April 2007 to July 2014.  During this time, I was assigned to investigate human and narcotics trafficking, as well as money laundering.

3.   During my tenure with the FBI, I have participated in investigations of violent crime, drug trafficking organizations, and large-scale street gangs, including investigations that have involved court-authorized interception of wire and electronic communications.  I have become familiar with the methods, language, structures, and criminal activities of criminal street gangs operating in and through this judicial district.  I have

become familiar with the types and amount of profits made by narcotics smugglers and the methods, language, and terms that are used to disguise the source and nature of profits from illegal narcotic dealings.

4.    During the course of my career, I have personally interviewed numerous gang members and narcotics traffickers. I have participated frequently in the debriefing of a significant number of cooperators, witnesses, confidential human sources, and defendants who had personal knowledge regarding criminal street gang activity, major narcotics trafficking organizations, and other criminal offenses, including violent crimes. Through these efforts, I have become very familiar with the methods used by gang members and narcotics traffickers. Specifically, I have become knowledgeable about the investigative techniques that are useful and viable in certain situations and those that are not. I have also consulted with other investigators who have extensive training and experience in criminal enterprises and financial investigations. I have executed numerous search warrants for gang and narcotics investigations, seeking evidence of the trafficking of controlled substances, weapons violations, gang indicia, and violent crimes.

5.    I am currently one of the lead case agents for the FBI LA GIT, a multi-agency task force investigating violent criminal street gang activities in San Bernardino County, California. This task force is comprised of the FBI, Department of Alcohol, Tobacco, Firearms and Explosives, the Drug Enforcement Administration, and the San Bernardino County Sheriff's

Department ("SBCSD"), the San Bernardino County Probation Department, the San Bernardino Police Department, and the Fontana Police Department.

## II. <u>PURPOSE OF AFFIDAVIT</u>

6.    This affidavit is made in support of a search warrant for one black and red HTC cellular telephone, model # OPM9110, FCC ID # NM80PM9110 with no subscriber information, International Mobile Equipment Identity number ("IMEI") 35267807886842 ("SUBJECT DEVICE 1"), and one gold Samsung Galaxy Note 5 cellular telephone with a shattered back glass plate[1] found in the center console of an abandoned Jeep bearing license plate 7XIY986 ("SUBJECT DEVICE 2," and collectively with SUBJECT DEVICE 1, the "SUBJECT DEVICES") described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) and 21 U.S.C. §§ 841(a)(1), (b)(1) (Possession with Intent to Distribute a Controlled Substance) (the "Subject Offenses").

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation

---

[1] The IMEI number and other identifying numbers are unreadable because of the shattered back plate.

into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On September 5, 2017, law enforcement began a car pursuit of black Jeep bearing California license plate 7XIY986 (the "Jeep").  At the conclusion of this car pursuit, law enforcement found the parked Jeep containing approximately 178 grams of methamphetamine and no occupants.  Law enforcement conducted a search of the general area and of the Jeep.  In a nearby backyard law enforcement found SUBJECT DEVICE 1 abandoned.  Based on the close proximity of SUBJECT DEVICE 1 to the abandoned Jeep, law enforcement believes SUBJECT DEVICE 1 was owned by one of the occupants of the Jeep and was dropped as they fled.  Law enforcement found SUBJECT DEVICE 2 in the center console of the Jeep.  Law enforcement later determined that SUBJECT DEVICE 2 had a latent fingerprint that matched Ernie Contreras' ("CONTRERAS") fingerprint.

9.    The SUBJECT DEVICES were abandoned at the scene and nobody has asked for their property back.  Law enforcement considers the SUBJECT DEVICES to be abandoned property.  However, in an abundance of caution, law enforcement also seeks this federal search warrant before searching the SUBJECT DEVICES.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Background of Investigation**

10.  Based on the reports that I have read, witnesses
interviewed, other law enforcement agents I have talked to, and
my participation in the investigation, I know that, on September
5, 2017, law enforcement was conducting surveillance in the area
of 555 West 21st Street in San Bernardino, California in
relation to an ongoing investigation.  During this surveillance
law enforcement saw a black Jeep bearing California license
plate 7XIY986 (the "Jeep") park near 555 West 21st Street.
Shortly after the Jeep arrived, a skinny Hispanic male adult,
whom was later identified as Jassiel Rodriguez, walked towards
the Jeep and entered the back seat on the driver's side.  After
approximately one minute, Jassiel Rodriguez got out of the Jeep
and walked back towards the apartment complex.  The Jeep made a
U-turn and left the area.  Members of the FBI LA GIT
surveillance team believe this activity was consistent with a
possible drug transaction.

11.  Shortly thereafter, a local law enforcement member of
the FBI LA GIT team driving an unmarked car saw that the Jeep
had illegally tinted windows in violation of California law and
attempted to perform a traffic stop on the Jeep.  The FBI LA GIT
officer turned on his police siren and began performing a
traffic stop on the Jeep.  The driver of the Jeep then sped away
and failed to stop at a solid red traffic light.  The driver of
the Jeep led officers on a pursuit in the city of San Bernardino
for approximately four and a half miles.  During the pursuit,

investigators and assisting officers from the San Bernardino
Police Department lost sight of the Jeep for a brief period of
time.  When officers found the Jeep, it was parked in front of
555 West 21st Street, San Bernardino, California, close to where
the pursuit began.  The occupants of the Jeep appeared to have
fled, abandoning the Jeep and its contents.  Both the front
driver's side door and passenger side doors were open when
police arrived.

        12.  Law enforcement searched the nearby area, and found,
among other things, SUBJECT DEVICE 1.  Law enforcement searched
the Jeep and found, among other things, approximately 178 grams
of methamphetamine and SUBJECT DEVICE 2.  Law enforcement never
located the occupants of the Jeep.  The Jeep was registered to
CONTRERAS' brother-in-law.  Witnesses later told law enforcement
that CONTRERAS used the Jeep.  Nearly an hour after the Jeep was
abandoned, CONTRERAS' sister called the police to report the
Jeep stolen.

        **B.   The Jeep**

        13.  Law enforcement conducted an inventory search of the
abandoned Jeep.  Law enforcement also had probable cause to
search the Jeep and could search the Jeep as abandoned property.
During the search of the abandoned Jeep, investigators located
the following items, among other things:

        a.   A total of approximately 178 grams of
methamphetamine which was located: 1) scattered on the
floorboard of the front passenger compartment seat
(approximately 46 grams), 2) in the dashboard behind the display

screen (approximately 116 grams), and 3) inside a silver purse located on the rear passenger seat floor (approximately 16 grams).

      b.   SUBJECT DEVICE 2, which was a gold colored Galaxy Note 5 cellular telephone with a shattered back casing found in the middle console.  SUBJECT DEVICE 2 was later determined to have a latent print which was a match to CONTRERAS' fingerprint. In a later interview with one of CONTRERAS' girlfriends, MORALES, MORALES told law enforcement that SUBJECT DEVICE 2 used to be her phone until CONTRERAS took it from her.  After CONTRERAS took SUBJECT DEVICE 2, MORALES cancelled the service on the phone.  MORALES also told law enforcement that CONTRERAS broke SUBJECT DEVICE 2 because she cancelled the cellphone service, then he kept the broken phone.

      c.   A Swisher Sweets package found in the driver's sun visor which was later determined to have a latent print which was a fingerprint match to CONTRERAS' fingerprint.

      d.   In the center console, law enforcement found papers bearing CONTRERAS' name, and an identification card bearing CONTRERAS' name and photograph.

      e.   On the front passenger seat floor, law enforcement found papers bearing Marina Santos' ("SANTOS") name.

      f.   Law enforcement also found a piece of mail bearing the name I.S. and a Georgia Insurance Policy card bearing the names I.S. and D.S.

**C.    Subject Device 1**

14.    During a search of the area for the former occupants of the Jeep, investigators found a baseball hat, a pack of cigarettes and SUBJECT DEVICE 1 in the backyard of 551 West 21st Street, which is located just to the east of the apartment complex at 555 West 21st Street.  The backyard of 551 West 21st Street was extremely close to the abandoned Jeep and was a possible escape route for the former occupants of the Jeep.  Law enforcement interviewed one of the occupants of 551 West 21st Street who said that he had not left a hat, a pack of cigarettes or SUBJECT DEVICE 1 in his backyard and those items did not belong to him.

15.    Based on my training and experience, and where SUBJECT DEVICE 1 was found, I believe SUBJECT DEVICE 1 belonged to one of the occupants of the Jeep who fled from law enforcement.  If allowed to search SUBJECT DEVICE 1, this information could help law enforcement identify the owner of this cell phone who likely possessed or conspired to possess the 178 grams of methamphetamine found in the Jeep.

**D.    Witness Interviews**

16.    On September 7, 2017, GIT investigators executed a state search warrant at 555 W. 21st Street, Apartment #3, San Bernardino, CA, the location law enforcement saw the suspected drug transaction and near where the Jeep was abandoned.  During the execution of this search warrant, investigators interviewed Jassiel Rodriguez ("Rodriguez") after he was found to be in possession of methamphetamine.  Rodriguez told law enforcement

that on September 5, 2017, he got into the Jeep, which was being driven by "Ernie Cervantes." I believe when Rodriguez mentioned "Ernie Cervantes" he was actually referring to "Ernie CONTRERAS" based on the totality of the other evidence, other witness statements, and the similarity between the names "Ernie Contreras" and "Ernie Cervantes."

17.    Rodriguez told law enforcement that he saw Ernie Cervantes' girlfriend in the front passenger seat. Rodriguez did not tell law enforcement if that girlfriend was MORALES or SANTOS. Rodriguez told law enforcement that he got into the back seat of the Jeep, smoked methamphetamine, then Ernie gave him a baggie containing methamphetamine. Rodriguez claimed that a short while after he got out of the Jeep, Ernie returned to Rodriguez's apartment and attempted to enter. Rodriguez claims he denied Ernie entry to his apartment and he saw Ernie leave. Rodriguez also admitted that Ernie was his methamphetamine supplier and that Rodriguez sells methamphetamine.

18.    In October 2018, law enforcement interviewed CONTRERAS who denied he was in the Jeep on September 5, 2017.

19.    In December 2018, I interviewed MORALES who told me that she was present in the Jeep with CONTRERAS on September 5, 2017. MORALES said that on September 5, 2017, CONTRERAS asked her to hide drugs and saw him attempt to hide drugs behind the radio in the Jeep. MORALES also told me that the bag of suspected drugs ripped and some of the contents spilled on the front passenger floorboard. MORALES described the drugs as a hard block. In my training and experience, MORALES' description

of the bag of drugs is consistent with a bag of crystal methamphetamine.  MORALES also told me that both CONTRERAS and she fled the Jeep after the pursuit by law enforcement.

20.  When law enforcement arrived at the Jeep, law enforcement found methamphetamine both scattered on the front passenger floorboard and behind the radio.  Law enforcement tested the suspected drugs found behind the radio, scattered on the floorboard, and in a purse in the Jeep and found the drugs were approximately 178 grams of methamphetamine.

21.  I believe the contents of both SUBJECT DEVICES will help corroborate who was present in the Jeep, who possessed the 178 grams of methamphetamine found in the Jeep, and may also contain additional evidence of a drug conspiracy related to sales of methamphetamine.

22.  Although a considerable amount of time has elapsed between the time of the pursuit and the time of this application, there have been no requests by any parties for a return of any of the property found in the Jeep or in the backyard of 555 West 21st Street.  The SUBJECT DEVICES have remained in the custody of FBI LA GIT law enforcement officers since that time.  Therefore, the property found in the car and around the scene, including the SUBJECT DEVICES, is considered abandoned property by law enforcement.  However, in an abundance of caution, law enforcement seeks this warrant for the SUBJECT DEVICES.

## V.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

23.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

11

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

  a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    26.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VI.    CONCLUSION

    27.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICES, as described in Attachment A.


_____
KEITH A. MACCALLA, Special
Agent, Federal Bureau of
Investigation


Subscribed to and sworn before me
this _____ day of January, 2019.


_____
HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE


13